

MAR 0 2 2019

Clerk, U S District Court
District Of Montana
Missoula

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| JOHN W. COLLIER, | Cause No. CV 15-79-BLG-SPW-TJC |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |
| STATE OF MONTANA, | |
| Respondent. | |

Petitioner John W. Collier (Collier) has filed an Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 of the Antiterrorism and Effective Death Penalty Act (AEDPA). Presently before the Court are Respondent State of Montana's (the State) Motion to Dismiss Petitioner John W. Collier's Amended Petition for Writ of Habeas Corpus (Doc. 62), and Collier's Motion for Order Granting Petitioner's Claim I in the Amended 28 U.S.C. § 2254 Petition. (Doc. 65.) Having carefully reviewed the record and considered the parties' submissions, the Court recommends that the State's motion be **DENIED**, and Collier's motion be **CONDITIONALLY GRANTED.**

1

Collier's Amended Petition initially alleged claims that (1) trial counsel was ineffective for failing to have Collier's mental competency evaluated; (2) postconviction counsel was ineffective for failing to request a mental competency evaluation in accordance with the order of the district court; and (3) postconviction counsel was ineffective for abandoning Collier's case. The Court previously dismissed claims 2 and 3 on the grounds that they were not cognizable in federal habeas. (Doc. 45.) Therefore, the only claim remaining is Collier's contention that trial counsel provided ineffective assistance. (Doc. 66.) Specifically, that trial counsel failed to have Collier's mental capacity evaluated and present evidence of his mental impairment at the time of sentencing.

As an initial matter, it appears that Collier's ineffective assistance claim is both untimely and procedurally defaulted. Therefore, the Court set an evidentiary hearing to determine whether equitable tolling of the AEDPA's one-year statute of limitations should apply, and whether Collier can establish grounds to excuse his procedural default. (Doc. 42.) Prior to hearing, however, the State conceded that Collier is entitled to equitable tolling, and waived its defense under AEDPA's statute of limitations. (Doc. 48 at 1-2.) Thus, the only outstanding issues before the Court are whether a basis exists to excuse the procedural default of Collier's ineffective assistance of trial counsel claim; and if so, whether Collier is entitled to habeas relief on that claim under 28 U.S.C. § 2254.

2

The State maintains Collier is not entitled to relief because: his claim is procedurally defaulted; *Martinez v. Ryan*, 566 U.S. 1 (2012) should not apply to excuse the default; even if *Martinez* does apply, the claim lacks merit under de novo review.  See generally, (Doc. 63.)  Collier counters that *Martinez* excuses the default.  (Doc. 66 at 3-6.)  Moreover, Collier asserts he is entitled to relief based upon the ineffective assistance provided by trial counsel, and requests this Court remand the matter to the state district court for resentencing.  *Id.* at 6-17.

For the reasons set forth herein, the Court finds there is a valid basis to excuse the default of Collier's remaining claim.  Moreover, trial counsel performed deficiently by failing to present evidence regarding Collier's competency at sentencing, and Collier was prejudiced as a result.  Accordingly, the Court recommends that Collier be granted habeas relief, and that this matter either be remanded to the state district court for resentencing, or that Collier be released from custody.

## I.    Factual Background

The entire procedural history of this matter has been set forth at length in prior orders of the Court.  See e.g. (Doc. 42.)  The facts necessary to resolve Collier's remaining claim are included herein, and will focus on the factual development of Collier's mental capacity before the trial court.

/ / /

3

### A. Pre-trial/Trial Proceedings

Collier was charged with incest in Montana's Fourteenth Judicial District, Musselshell County. The criminal charges arose from a companion dependency and neglect proceeding, also filed in Mussellshell County. In the course of the dependency and neglect matter, Collier was interviewed by sex offender specialist, Marla North. During the interview, Collier made certain incriminating statements.

Collier's family later retained Jack Sands to represent him in the criminal case. Sands filed a motion to suppress evidence of prior bad acts, including the comments made to North. A hearing was held on the motion, and Collier testified.

With respect to his mental capacity, Collier testified that although he was enrolled in a college program for two years, he did not complete the program. Collier also explained that he had been in special education classes in high school and that "his brain doesn't focus too well." (Doc. 11-5 at 4.) Collier testified that during his interview with Marla North, he advised North that he had some problems with understanding, had learning disabilities, and that he had been in special education classes. *Id.* at 9. On cross examination, Collier advised that he could read "very little," and explained "I can't write very well, but I can write some." *Id.* at 23. He also advised the college textbooks were too hard for him to read, and that he required assistance taking his driving test and had the examination questions read to him. *Id.*

4

Collier's mother, Marian Collier, also testified at the hearing. She conveyed that Collier had been in special education classes, he was developmentally disabled, and he had difficulty reading and writing. *Id.* at 44-46.

In ruling on Collier's suppression motion, Montana District Court Judge Loren Tucker provided the following observations regarding Collier's mental capacity:

> I'm a little concerned about defendant's apparent inconsistency in responses to a variety of questions. On the one hand he testified that he read college textbooks, and then on another hand testifying that he can't read very well. It's really not credible that he spent two years in college studying computer science and then simply didn't understand that he was studying computer science.[1]
>
> Be that as it may that he may have difficulty in deciphering words and misspelling them, that does not translate into a lack of comprehension of the discussion situation, and I don't find that the defendant had an inability to comprehend the circumstances.
>
> The fact that he's 41 years of age by virtually anyone's definition is middle age. It doesn't appear that he is a particularly sophisticated individual, but sophistication doesn't translate to illiteracy or inability to comprehend.
>
> In addition to that apparent unsophisticated appearance here today in court may be somewhat disingenuous and designed for purposes of advancing his case today.

---

[1] Apparently, at the Salish Kootenai College, Collier was on a pass-fail crediting system, which was based solely on his attendance. See, (Doc. 11-31 at 5.) Also, Collier's self-report that he took the computer science curriculum is contradicted by a review of his transcript which was not provided to the district court until Collier's postconviction proceedings. See, *Id.* at 10. See also, Bohlman Depo. (Doc. 66-1 at 11.)

(Doc. 11-5 at 65-66.)

The court went on:

> I would recognize that this defendant is not, at least as he appears on the stand today, not particularly articulate. But I do not find anything that indicates that he is unable to comprehend what is told to him. There is nothing that indicates on the day in question that he had diminished capacity to make full use of his [ ] faculties.

*Id.* at 68. The trial court denied Collier's motion to suppress.

At trial, Collier testified on direct examination that he graduated from Melstone High School, and that he attended the Salish-Kootenai College for two years. Collier testified that he had learning problems in school and had a tutor, explaining "[w]hen I first went to the college I was going into computer science, but it got too tough for me and I only went three days in the computer science. Then they took me out of computer science and put me in a tutor to see if they could get my reading and my writing better to where I can go on with the computer science." (Doc. 11-8 at 104-5.)[2] Collier also testified that he was on social security disability for an injury sustained in a car wreck and for damage to his brain. *Id.* at 131. On cross examination, Collier was asked again about his social security income, and stated it was for his back and "then plus the damage in my brain that it's not all together there too well." *Id.* at 140.

---

[2] See also, Salish Kooteani College Transcript (confirming Collier did not complete Introduction to Information Systems and did not take any additional computer science classes, aside from typing). (Doc. 11-31 at 10).

**B. Sentencing Proceedings**

After his conviction, Collier was required to undergo a psychosexual

evaluation for sentencing, which was performed by Michael D. Sullivan.  See,

(Doc. 11-19 at 18-31).  Because of "obvious reading deficits," Sullivan had the

tests read to Collier.  *Id.* at 21.[3]  The evaluation also noted that Collier reported he

was "just passed along [in school] and graduated," that he needed a tutor, and that

he had difficulty reading and writing.  *Id.* at 22.  The evaluation found Collier to be

"below average in intelligence" and to have "learning deficits."  *Id.* at 23.[4]

Following the evaluation, Sullivan provided damaging testimony at Collier's

sentencing hearing.  He explained that he determined Collier to be a Level 3

Sexual Offender, (Doc. 11-17 at 6-7); that Collier had previously entered into a 2-

year deferred prosecution agreement in Lake County stemming from allegations

that he had abused his stepdaughter, *id.* at 11-12; that a finding had been made in a

civil trial court proceeding that Collier had sexually abused two other

stepdaughters, *id.* at 28; that Collier himself had been a victim of sexual abuse, *id.*

---

[3] See also, (Doc. 11-17 at 4-5) (indicating Sullivan had a case manager read testing materials to Collier).

[4] Additionally, although he denied being a victim of sexual abuse himself, Sullivan noted in a prior evaluation that Collier had disclosed being molested by three different male adults, including an uncle, when he was a child. *Id.* at 23.  See also, (Doc. 11-17 at 97-98) (Collier disclosed to Marla North that he was being abused by three different adult males (an uncle, his father's friend, and an older brother's friend) from age 9 to 14.)

at 16-17; and that Collier tended to engage in image management or "adjusting one's presentation to meet perceived situational demands or needs" and was dishonest. *Id.* at 18.  Sullivan opined Collier would do poorly in treatment, and that his responses to several statements were "reflective of a belief system that is consistent with sexual abusers or pedophiles." *Id.* at 20-21, 22.  Sullivan found Collier had a high risk of reoffending, and that Collier engaged in dishonesty by lying and omitting important information. *Id.* at 29, 32, 34.[5]  Sullivan recommended Collier complete sex offender treatment in prison. *Id.* at 35.

On cross-examination, Sands asked Sullivan whether he was "aware that John has learning disabilities, reading disabilities, and some understanding – cognitive disabilities?" (Doc. 11-17-at 57-8.)  Sullivan acknowledged he was aware of Collier's learning disabilities and reading deficits and explained that is why the test questions were read to him. *Id.* at 58.  Sands followed up by asking if Collier's "cognitive difficulties" could have impacted his understanding of testing questions and been the reason for some fairly alarming responses Collier provided.

---

[5] Sullivan also explained one of the factors used in making his overall risk assessment was that Mr. Collier was "[a]n individual who presented as inadequate and inept socially," which he explained was a common feature for adult child sexual abusers because "[t]hey come to identify more with children perhaps more easily than adults at times and seek a child out to meet their needs, including what they perceive to be their sexual needs." (Doc. 11-17 at 33.)  He also explained that Collier appeared have "significant cognitive distortions." (Doc. 11-17 at 33-34) (addressing Collier's performance on Abel and Becker Cognition Scale.)

*Id.* at 58. While Sullivan conceded that was a possibility, he explained that accommodations had been made during testing to control any potential misunderstanding. *Id.*

Marla North also testified at Collier's sentencing regarding the psychosexual evaluation she had administered to Collier. *Id.* at 89-90. Collier admitted to North that he had inappropriately touched his stepdaughter, and that he had been on probation for that offense. *Id.* at 93-95. He also disclosed that he had sexual contact with two of his nieces. *Id.* at 95-97. North opined that Collier's "way of thinking in regard to sexuality between adults and children is on a deviant track." *Id.* at 100. North also designated Collier as a high risk to reoffend. *Id.*

The State also called Sally McRae, the probation officer who prepared the presentence investigation report. McRae testified that she noticed several discrepancies in preparation of the report, tending to indicate Collier was dishonest with her. *Id.* at 110. McRae recommended a minimum 40-year prison sentence, with 15 years suspended, and that Collier be ineligible for parole until he completed both phases of the sex offender program. *Id.* at 115.

Sands did not call any expert witness to counter the testimony of Sullivan or North. Rather, Sands relied primarily upon neighbors, acquaintances, and family members of Collier who testified that they would be comfortable with Collier being supervised in the community, and believed Collier would follow directives

9

and comply with the terms of his sentence.[6] Additionally, in response to the
testimony that Collier was someone who would lie or conceal his personality,
Sands argued "[Collier] has some learning disabilities I think that would even
make that difficult." *Id*. at 171.

The State asked that Collier be sentenced to 60 years at the Montana State
Prison, and that he be deemed ineligible for parole. *Id*. at 165, 168. Sands asked
for a lengthy suspended sentence with no period of incarceration, aside from credit
for time already served. *Id*. at 171-72. It appears, however, that Sands mistakenly
believed that the statute called for a mandatory minimum sentence of 30 days,
when Collier's incest conviction carried a minimum term of 4 years of
imprisonment. *Id*.[7] When the court pointed this out, Sands acknowledged that the

_____

[6] Sands called: Charles Poulos, a detention officer who had supervised Collier in
the Musselshell County Detention Center and found him to have a good attitude
and be cooperative, *id*. at 129-130; Judy Metzger, a neighbor of Collier's who got
along with him well, found him to be honest, and believed he would follow the
instructions of the court and probation officer, *id*. at 133-135; Bernadine Lovell,
testified she believed Collier "goes by the letter of the law," is honest, and gets
along well with people. *Id*. at 139-143; Thad Bassett, a neighbor, found Collier to
be honest and would have no problem with him being supervised in the
community, *Id*. at 147-149; John Albert, an acquaintance through church who
regularly visited Collier while he was incarcerated, found Collier to be likeable and
would have no problem with him being supervised in the community. *Id*. at 150-
52. Sands also called Marian Collier, Collier's mother, who testified it would be a
hardship on the family if Collier was sent to prison and that such a sentence would
"destroy" Collier. *Id*. at 156-159.

[7] "If the victim is under 16 years of age and the offender is 3 or more years older
than the victim…the offender shall be punished by life imprisonment or by

10

four-year minimum sentence could not be suspended. *Id.* at 172.

The court ultimately sentenced Collier to 50 years at the Montana State Prison, with 20 of the years suspended. The Court also "strongly recommended" that Collier complete both phases of the sex offender program prior to parole eligibility. *Id.* at 191. In support of this sentence, the trial court observed:

> The concern about the inadequacy of your social skills comes from your own reporting, and I don't believe that it has an impact on your capability of having a casual conversation with others, but it has to do with the way you have conducted yourself in your life.

*Id.* at 181. The court also noted that even though Collier may have been a victim of sexual abuse himself, it was no excuse for his actions. *Id.* at 182. The court went on to observe:

> You don't have any significant work skills that would aid you that you could throw yourself into your work and keep yourself out of a path of criminal conduct. You've reported that you have a physical disability. It's apparent that you must have if you're obtaining social security benefits. You, by your own report and the unrefuted evidence, demonstrate that you lack academic skills, and you're now at middle age, so frankly, sir, it doesn't seem that there's very much prospect that those things are going to change. Unfortunately, as I review those things, there's simply nothing there that will assist you that would suggest that something could be done with you in a lesser restrictive environment.

*Id.* at 182-83. The court went on to note that Collier was dishonest, failed to accept responsibility for his conduct, *id.* at 183-84, that he was a predatory sexual

---

imprisonment in the state prison for a term of not less than 4 years or more than 100 years and may be fined not more than $50,000." § 45-5-507(4) (2001).

offender who used coercion and force against children, *id.* at 184, and that he was a

high risk to reoffend. *Id.* at 185. The court also found Collier was not a good

candidate for rehabilitation, and again articulated the court's belief that Collier was

deceptive in how he portrayed himself to others, stating:

> I need to repeat that the fact that you've been able to present yourself
> on a reasonable basis to members of even a small community doesn't
> answer the question, and the reason for that is it would be perfectly
> logical for a person who terrorized his neighbors and terrorized young
> children to be able to exploit them. It stands to reason that it wouldn't
> be possible for you to do so if you came across as an ogre.

*Id.* at 186.

### C. Direct Appeal

Collier appealed to the Montana Supreme Court. As one of his claims on

appeal, Collier attempted to argue trial counsel was ineffective for failing to

develop testimony regarding his mental impairment for purposes of sentencing.

See, Br. Appellant (Doc. 11-21 at 23-25.) Collier attached records in support of

his argument that were not contained within the district court record. *Id.* at 32-35.[8]

The Montana Supreme Court declined to address the ineffective assistance claim

on direct review, and noted the claim could be appropriately raised and addressed

in a petition for postconviction relief. *State v. J.C.*, 2004 MT 75, ¶¶ 26-27, 320

---

[8] These documents included a 9/16/76 Wechsler Intelligence Scale for Children, *Id.*
at 32-33; a Special Services Skills Assessment, *id.* at 34; and a copy of Collier's
transcript from Salish Kootenai College. *Id.* at 35.

Mont. 411, 87 P. 3d 501.

### D. State Postconviction Proceedings

With the assistance of another inmate, Collier sought state habeas corpus relief by filing a petition in the Montana Supreme Court. The Supreme Court forwarded the petition to the state district court for filing, with instructions that the court consider Collier's request for appointment of counsel. (Doc. 11-28 at 2.) In a subsequent order, the district court appointed John Bohlman to represent Collier in the postconviction proceedings, and noted:

> [Collier's] theory regarding mental capacity is potentially important. The trial process did not address mental capacity. The Supreme Court noted that such issue could be addressed by postconviction relief.... If in fact Defendant is less able than the average person due to mental shortcomings, Defendant would be disadvantaged by a requirement that he represent himself in post-conviction proceedings. The crime[] of which he is convicted [is] serious. He has been sentenced to a lengthy prison term. The assertion that he is unable to fully appreciate all of the circumstances is serious.

(Doc. 11-30 at 1-2.)

Bohlman filed an Petition for Postconviction Relief, which included a claim that Collier "had ineffective counsel who should have presented at sentencing evidence of Defendant's diminished capacity." (Doc. 11-31 at 4.)

Eventually, the parties stipulated that an updated evaluation should be performed on Collier. The issues to be addressed were: (1) whether Collier suffered from a mental disease or defect, or developmental disability, to the extent

that he could not fulfill the requirements of his sentence at Montana State Prison;

and (2) whether Collier suffered from any of those three conditions in the past to

the extent that he was unable to assist his attorney with his trial or sentencing.

(Doc. 11-43 at 1.) The parties agreed Michael Scolatti Ph.D. would perform the

evaluation. *Id.* at 2. The evaluation was to further address: (1) whether Collier

suffered from a mental disease, defect, or developmental disability; (2) if Collier

did not suffer from any of those conditions in the manner defined by Mont. Code

Ann. Title 46, Chapter 14, the evaluator was to determine whether Collier had a

developmental disability or was seriously developmentally disabled as defined in

Mont. Code Ann. § 53-20-102(5) & (15); and (3) the evaluator was to complete a

full-scale intelligence quotient of Collier, including interpreting his Stanine scores

from the Salish-Kootenai Community College, determine his reading ability,

ability to understand spoken instructions, and all measurable cognitive functions.

*Id.*; See also, (Doc. 11-44) (district court's 12/12/05 Order adopting parties'

stipulation).

Dr. Scolatti completed his intellectual/cognitive assessment of John Collier

on June 17, 2006. (Doc. 12-3.) But instead of responding to the specific mandate

outlined by the parties and the district court, Scolatti explained his assessment

would address Mr. Collier's current cognitive/intellectual functioning, purportedly

to decide whether it was feasible for him to participate in the treatment programs

14

offered at the prison. *Id.* at 1, 4. Accordingly, in his summary and recommendations, Dr. Scolatti found that Collier would have to work hard and use a tutor to get through the treatment programs, but it could be done. *Id.* at 4. Despite finding that Collier scored in the 4th percentile on the Kaufman Brief Intelligence Test (*id.* at 3), and that his verbal and math scores were equivalent to that of a 5th grade level (*id.* at 4), Dr. Scolatti noted that it was "interesting" that Collier graduated high school and spent three years in college "amassing 71 credits." *Id.* at 4. Scolatti opined that Collier could be placed in the "special needs" sex offender program. *Id.* Further, Scolatti found that "[t]he greatest impediment to Mr. Collier's treatment is not his cognitive impairments, but his denial of his crime and any significant sexual problems. If he maintains this position, he will not be placed in treatment programs." *Id.* at 4-5.

Therefore, contrary to the district court's order, Scolatti did not opine whether Collier suffered from a mental disease or defect or developmental disability, under Mont. Code Ann. Title 46, Chapter 14, or whether he suffered from a developmental disability and/or was seriously developmentally disabled under Mont. Code Ann. § 53-20-102, and was unable to assist his attorney at trial or sentencing. There was also no mention in the Scolatti evaluation of whether Collier's mental capacity was significantly impaired before, during, or after the commission of the offense.

15

During this same time period, Bohlman was struggling with his own personal health issues.  Bohlman's difficulties ultimately resulted in him leaving the practice of law and moving to Vietnam in 2007.  When he did so, Bohlman did not withdraw from his representation of Collier, and he did not notify Collier that he would no longer be representing him.  There was a handwritten note recovered from the Musselshell County Attorney file several years later which states: "John has indicated he will file a motion to withdraw the petition for post-conviction relief." (Doc. 11-48 at 8.)  But Bohlman denies ever communicating to the County Attorney's Office that he intended to withdraw Collier's postconviction petition. (Doc. 66-1 at 11.)

After Bohlman's departure, Collier's Musselshell County postconviction file sat inactive for over five years.  In January of 2011, with the assistance of another inmate, Collier sent a "Motion for Clarification and Order for Compliance" requesting information regarding what had transpired during the postconviction proceedings. (Doc. 11-46.)  The district court ordered the parties to show cause why the matter had not moved forward in years. (Doc. 11-47.)

The Mussellshell County Attorney and the Regional Deputy Public Defender for the Office of the Public Defender (OPD), Douglas Day, responded to the Court's order.  Both advised the Court that they were not previously involved in the proceedings, but they believed Collier was not entitled to further relief and that

16

the petition had been withdrawn.  (Doc. 11-48 at 3; Doc. 11-49 at 4.)

The court, nevertheless, pressed the parties for additional information.  The court ordered that the parties file a statement that there is no basis for further relief, and ordered that the OPD appoint counsel for Mr. Collier to make that determination.  (Doc. 11-50 at 2.)

Day responded that it was the "explicit opinion of the OPD that [Collier was] not entitled to any further relief."  (Doc. 11-51 at 1.)  Day characterized Collier's actions as an attempt to get "another bite at the apple at public expense."  Day said Collier had already benefitted by receiving the Scolatti evaluation, and that he would not benefit further by bringing the evaluation before the district court.  *Id.*

Day stated the Scolatti evaluation:

> would not suggest [Collier] was unfit to proceed.  It would not suggest that he suffered a mental disease or defect that would raise the issue that he was guilty but should receive a sentence to DPHHS rather than the sentence he has already been given.  The evaluation would not suggest that he did not have the requisite mental state in order to be convicted of the offense he was found guilty of.  In other words, the evaluation would not help him.

*Id.* at 2.  Further, Day opined, "[i]t would be folly for his counsel to admit Dr. Scolatti's evaluation in that the report would do him more harm than good."  *Id.* Additionally, Day believed there was no prejudice from the delay in the postconviction proceedings because Collier could not demonstrate that the result of

the proceedings would have been different had Bohlman not abandoned the case. *Id.* at 3.  Day requested that the court "rescind its order to the extent it requires counsel to be appointed to [Collier]" and said the "court should order that this matter be closed without further argument or proceedings."  *Id.* at 2, 3.  Day stated:

> This college educated defendant is not entitled to any further relief. He received the ordered evaluation.  It could not have benefited him in 2006; nor could it benefit him now.  The time for him to file an additional petition for postconviction relief has long passed.  A positive outcome for the defendant is highly unlikely even if the court entertained his motion for addition[al] relief at hearing.

*Id.* at 3.

On April 5, 2011, the district court accepted Day's representations, despite not "being provided an affidavit or any other evidence," and dismissed Collier's postconviction petition with prejudice.  (Doc. 11-53.)  Without addressing the merits of the petition, the court found "it appears that [Collier] reasonably timely obtained the relief to which he was entitled and that his opportunities to pursue further relief have expired."  *Id.*  Collier did not appeal the dismissal of his petition.

### E.  Federal Habeas Proceedings

In the course of these proceedings, Collier underwent an updated psychological evaluation performed by Dee Wolston, PhD.  (Doc. 66-2.)  Dr. Wolston found Collier's full-scale IQ to be 69, in the 2nd percentile, which

correlates to the Extremely Low to Borderline category of overall intellectual functioning. *Id.* at 8, 11 (noting the "designation of Mild Mental Retardation would have been used in past decades."). Dr. Wolston opined that Collier's IQ scores and level of adaptive functioning indicate a diagnosis of Intellectual Disability, mild severity. *Id.* at 9, 11.[9] Based upon Collier's history of developmental delay as a child, Dr. Wolston found Collier's current IQ to be the same in the present day as it was "ten, twenty, or fifty years ago." *Id.* at 11.

The parties were also allowed to depose trial counsel, Jack Sands, and postconviction counsel, John Bohlman. See e.g., (Doc. 66-1) (Bohlman deposition); (Doc. 66-3) (Sands Deposition).

Sands testified Collier appeared to be slow mentally. (Doc. 66-3 at 8-9.) He said Collier's speech seemed slow and "he looked odd." *Id.* at 10. Sands explained he "didn't look like he was bright and intelligent . . . he looked like he could have some mental difficulties." *Id.* at 82. Sands was also aware that Collier had learning disabilities, and he "had some concerns about his decision-making capacity, his ability to express himself, and his – the way he would appear to the jury." *Id.* at 30. He explained that it would have been apparent to a jury that Collier had learning disabilities. *Id.* at 65. Nevertheless, Sands testified he did not

---

[9] Wolston explained that in past decades the designation of mild mental retardation would have been used to describe Collier. See, (Doc. 66-2 at 8, 11.)

19

obtain any medical records, social security disability records, educational records, or records of intellectual testing, and he did not interview any teachers or professionals who worked with Collier while in school. *Id.* at 15, 20. He also did not have Collier evaluated, explaining that Collier "or his parents would have had to pay for [the evaluation]. I assume it's fairly expensive, and they didn't have any interest in doing that or expressed no interest in doing that." *Id.* at 27.

Bohlman testified that he and Collier went to the same "really small school" in Melstone, Montana. (Co. 66-1 at 10.) Although Collier received a high school diploma, Bohlman said he did not go to "regular classes." *Id.* He added that Collier was never mainstreamed in the school; he was "in self-contained special education," and was "always in the room just with the special education teacher." *Id.* at 10, 31. He agreed that Collier was simply "socially promoted through school." *Id.* at 32. He testified that "he was very slow," and "[p]eople would have referred to he as 'retarded' before the word became not used." *Id.* at 11. He also testified that his "retardation" was obvious, and his disability would have been readily apparent to an attorney representing him. *Id.* at 31, 41. Bohlman further opined that Collier could not have understood concepts such as exhausting legal remedies or other complexities of the legal system. *Id.* at 34-35.

## II.    Applicable Law/Analysis

As set forth above, Collier's remaining ineffective assistance of trial counsel

claim is procedurally defaulted.  Therefore, before addressing the merits of the claim, the Court must first determine whether adequate cause and prejudice exists to excuse the default of this claim.

### A. Procedural Default

Before a state prisoner may present a claim to a federal court, he must first exhaust his available state remedies.  28 U.S.C. § 2254(b)(1)(A); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).   To do so, the petitioner must invoke one complete round of the state's established appellate review process, fairly presenting all constitutional claims to the state courts so that they have a full and fair opportunity to correct alleged constitutional errors at each level of appellate review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  When a habeas petitioner has not fairly presented a constitutional claim to the highest state court, and it is clear that the state court would now refuse to consider it because of the state's procedural rules, the claim is said to be procedurally defaulted. *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996).  There is no dispute that Collier's ineffective assistance claim is procedurally defaulted here.

As a general matter, habeas review of a defaulted claim is barred unless a petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Ordinarily, "cause" to excuse a default exists if a petitioner can

21

demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* at 753. "A habeas petitioner demonstrates prejudice by establishing that the constitutional errors 'worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Schneider v. McDaniel*, 674 F.3d 1144, 1153 (9th Cir. 2012) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982). A petitioner has the burden of proving both cause and prejudice. *Coleman*, 501 U.S. at 750.

*Coleman* established that ineffective assistance of postconviction counsel does not establish cause for the procedural default of a claim. *Id.* In *Martinez v. Ryan*, however, the Supreme Court recognized a narrow exception to the *Coleman* rule, explaining:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-collateral review proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Martinez v. Ryan*, 566 U.S. 1, 6-17 (2012); see also *Trevino v. Thaler*, 596 U.S. 413, 423 (finding *Martinez* applies to a procedurally defaulted trial-phase ineffective assistance claim if "the claim...was a 'substantial' claim and the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding" (quoting *Martinez*)).

22

The State maintains that the *Martinez* exception is not applicable for several reasons. The State initially argues it does not apply here because the default of the ineffective assistance claim did not occur in the initial postconviction proceedings, but rather on appeal from that collateral proceeding. The State argues that Collier's ineffective assistance claim was "litigated in some fashion" before the district court; Collier received "some relief in the form of an evaluation"; and the matter was dismissed because it did not appear further relief was warranted. (Doc. 63 at 7.)

The State is correct that the *Martinez* exception applies only to the ineffectiveness of postconviction counsel in the initial postconviction review. It "does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 16. Accordingly, a petitioner may not rely upon attorney error that occurred in "appeals from initial-review collateral proceedings." *Id.*

That is not the situation here. While the ineffective assistance claim was initially raised in the postconviction proceedings, it was effectively abandoned and withdrawn without any review of the merits of the claim. Bohlman terminated his representation of Collier in the middle of the postconviction proceedings, and effectively abandoned the ineffective assistance claim. He left the country without notifying the court, the state, or Collier that he would no longer be pursuing

23

Collier's claim. The claim then remained dormant for over five years.

Once the OPD and the state were ordered to show cause why the matter had not been pursued, both parties indicated that the petition had been withdrawn. See Doc. 11-48 at 3 (state's response requesting dismissal of the petition, and representing that a note in the file indicated that "John [Bohlman] has indicated he will file a motion to withdraw the petition for post conviction relief."); and Doc. 11-49 at 4 (OPD response stating "[t]he state is absolutely correct. The original petition became moot, fruitless and was withdrawn.")

In addition, in response to the court's subsequent order that the OPD appoint counsel to determine whether Collier was entitled to any relief, Day essentially refused to provide representation for Collier. Instead, Day advocated for the dismissal of the petition with prejudice. (Doc. 11-51 at 3.) He further asked the court to rescind the order requiring counsel to be appointed for Collier, and argued that any further postconviction relief was time barred. (Doc. 11-51 at 1, 3.)

The court accepted Day's "assertions from an Officer of the Court as true," and found that Collier had obtained the relief to which he is entitled and that "his opportunities to pursue further relief have expired." (Doc. 11-53 at 1.)

Thus, Bohlman's abandonment of Collier's case, and Day's subsequent refusal to provide representation, resulted in an effective withdrawal of the claim in the initial-review collateral proceeding, and a finding that any further relief was

time barred. Thus, the default and attorney error occurred at the initial-review collateral proceeding, not on appeal.

In addition, the State appears to maintain that the *Martinez* exception should not apply to Montana petitioners, because Montana's procedural framework for handling ineffective assistance claims does not bar individuals from raising those claims on direct appeal. See e.g., Ans. (Doc. 33 at 36, f.n. 1); see also, Resp. Br. (Doc. 63 at 6-7). But defendants are generally precluded under Montana law from raising ineffective assistance claims requiring development of the record on direct appeal and are required to bring those claims in postconviction proceedings.[10] Therefore, this threshold requirement for application of the *Martinez* exception is also satisfied. See *Trevino*, 569 U.S. at 428 (although state did not explicitly bar ineffective assistance of trial counsel claims on direct appeal, *Martinez* exception applied where the "procedural system – as a matter of its structure, design, and operation – does not offer most defendants a meaningful opportunity to present" such claims on appeal.)

The Ninth Circuit recently engaged in a thorough analysis of the remaining

---

[10] See e.g., *Gunderson v. Kirkegard*, No. CV 13-35-BLG-CSO, Or. (Doc. 43, 4-8) (D. Mont. Jan. 30, 2015); *Miller v. Kirkegard*, No. CV 13-13-GF-DWM-JTJ, Or. (Doc. 50 at 25-26) (D. Mont. May 20, 2015); *Passmore v. Frink*, CV-13-121-BLG-COS, Or. (Doc. 33 at 19-20) (D. Mont. June 16, 2015). See also, I C, ante, wherein the Montana Supreme Court refused to address Collier's IAC of trial counsel claim on direct appeal and instead suggested postconviction was the proper proceeding in which to bring the claim.

requirements of the *Martinez* exception in *Ramirez v. Ryan*, 937 F.3d 1230 (9th Cir. 2019). Although *Ramirez* was a capital case, it similarly presented a claim of ineffective assistance of trial counsel for failing to investigate and present evidence of the defendant's mental impairment at sentencing. The claim had also been procedurally defaulted in the state postconviction proceedings.

In determining whether the default could be excused, the Ninth Circuit outlined how cause and prejudice under the *Martinez* exception can be established. To establish "cause" under *Martinez*, a petitioner must demonstrate that post-conviction counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). In order to do so, it must be shown "that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceeding would have been different." *Ramirez*, 937 F.3d at 1241 (quoting *Claybourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014). The assessment of whether the result of postconviction proceedings would have been difference necessarily requires an evaluation of the strength of the underlying ineffective assistance claim. *Id.*

To establish "prejudice" under *Martinez*, it must be demonstrated that "the underlying ineffective assistance of trial counsel claim is 'substantial.'" *Ramirez*, 937 F.3d at 1241. In *Martinez*, the Supreme Court defined substantial as having "some merit," and it cited the standard for the issuance of a certificate of

appealability for guidance. *Martinez*, 566 U.S. at 14-16. Under that standard, a

petitioner must show "that reasonable jurists could debate whether the issue should

have been resolved in a different manner or that the claim was adequate to deserve

encouragement." *Ramirez*, 937 F.3d at 1241.

The Ninth Circuit pointed out that the analysis of cause and prejudice under

*Martinez* will necessarily overlap, since both require an evaluation of the strength

of the underlying ineffective assistance of trial counsel claim. *Id.*

Putting these considerations together, the Ninth Circuit concisely

summarized the cause and prejudice requirements of the *Martinez* exception as

follows:

> Thus to establish cause and prejudice in order to excuse the procedural
> default of his ineffective assistance of trial counsel claim, [a petitioner] must
> demonstrate the following: (1) post-conviction counsel performed
> deficiently; (2) "there was a reasonable probability that, absent the deficient
> performance, the result of the post-conviction proceedings would have been
> different," *Id.*; and (3) the "underlying ineffective-assistance-of-trial-counsel
> claim is a substantial one, which is to say that the prisoner must demonstrate
> that the claim has some merit." *Martinez*, 566 U.S. at 14, 132 S.Ct. 1309.

*Ramirez*, 937 F.3d at 1242.

As discussed above, the first two requirements determine whether there is

cause to excuse the procedural default. In this case, there is no question regarding

the first requirement; Bohlman performed deficiently. He simply abandoned the

claim without providing notice to the court, the state, or Collier. Collier was then

essentially left without counsel after Bohlman's departure and the OPD's refusal to

27

provide representation. *Martinez* applies either when a petitioner has no counsel or only ineffective counsel. The Ninth Circuit has found that "a petitioner who was *not* represented by post-conviction counsel in his initial-review collateral proceeding is not required to make any additional showing of prejudice over and above the requirement of showing a substantial trial-level IAC claim." *Rodney v. Filson*, 916 F.3d 1254, 1260 (9th Cir. 2019) (emphasis in original). In other words, an unrepresented petitioner does not need to show a reasonable probability that the result of the postconviction proceeding would have been different.

Regardless of which analysis applies, Collier can make a showing of prejudice here. As discussed below, Collier has demonstrated a meritorious ineffective assistance of trial counsel claim.[11] Therefore, there is a reasonable probability that the result of Collier's postconviction proceeding would have been different if counsel would have performed effectively in prosecuting and presenting the claim. Collier has thus established cause to excuse the procedural default.

For the same reason, Collier can establish prejudice under *Martinez*. To determine whether a claim of ineffective assistance of trial counsel claim is

---

[11] In *Ramirez*, the Ninth Circuit found the district court erred in considering the ineffective assistance of trial counsel claim without allowing the petitioner the opportunity to develop the evidentiary record. *Ramirez*, 937 F.3d at 1248. Here, however, the parties were given the opportunity to conduct discovery to develop the record and have briefed the merits of the ineffective assistance claim.

substantial, the Court must examine the claim under *Strickland* – the same standard

to determine the merits of Collier's claim.  See *Ramirez,* 937 F.3d at 1245.  As

discussed below, analysis of the claim under *Strickland* demonstrates that Collier's

claim is meritorious.  Therefore, the claim is substantial, and Collier has

established prejudice under *Martinez*.

### B. Ineffective Assistance of Counsel

Because Collier has established a valid basis to excuse the procedural

default, this Court reviews his ineffective assistance of counsel claim de novo.

*Pirtle v. Morgan*, 313 F.3d 1160 (9th Cir. 2002); *Dickens v. Ryan*, 740 F.3d 1302,

1320 (9th Cir. 2014).

"The Sixth Amendment guarantees criminal defendants the effective

assistance of counsel."  *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003) (per curiam);

see also, *Missouri v. Frye*, 566 U.S. 134, 138 (2012) ("The right to counsel is the

right to effective assistance of counsel.")  In order to prevail on a claim that

counsel was ineffective, a petitioner must show that counsel's performance fell

below an objective standard of reasonableness, and there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.  *Strickland v. Washington*, 466 U.S. 667-88,

694 (1984).  "A reasonable probability is a probability sufficient to undermine

confidence in the outcome."  *Id.*

When reviewing an ineffective assistance claim, scrutiny of counsel's performance is highly deferential, and this Court "must indulge in a strong presumption that counsel's conduct falls within the wide range of professional assistance." *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (quoting *Strickland*, 466 U.S. at 689). The defendant has the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689.

The Sixth Amendment right to counsel extends to noncapital sentencing proceedings. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 202-04 (2001); *Daire v. Lattimore*, 812 F. 3d 766, 767 (9th Cir. 2016) (en banc) (holding that *Glover* clearly established *Strickland* applies in non-capital sentencing proceedings). "Even though sentencing does not concern the defendant's guilt or innocence, ineffective assistance of counsel during a sentencing hearing can result in *Strickland* prejudice because 'any amount of [additional] jail time has Sixth Amendment significance.'" *Lafler*, 132 S. Ct. at 1386 (quoting *Glover*, 531 U.S. at 203).

### 1. Deficient Performance

Given his mental impairment, Collier argues that Sands' failure to have him psychologically evaluated or present any evidence of his mental disability at sentencing constitutes deficient performance. (Doc. 66 at 8-9, 10.) Collier further

30

argues that this deficient performance undermines confidence in the sentence imposed, particularly because it is likely that the court would not have imposed a parole restriction requiring him to complete sex offender treatment.[12]  In addition, had it been provided a full picture of Collier's level of functioning, Collier contends the court would likely have committed him to the Department of Health and Human Services, rather than the Montana State Prison.  (Doc. 66 at 8-9.)

The State responds that the evaluation performed by Scolatti demonstrates that Collier's denial of his crime and denial of any sexual dysfunction are the source of Collier's difficulties, not his cognitive impairments.  (Doc. 63 at 10-11.) The State further argues that Scolatti's observation is consistent with the historical information presented at sentencing relative to Collier's completion of high school and college attendance, in spite of his low IQ.  *Id.*  The State also argues that Sands did not perform deficiently because Collier and his parents all assented that Collier was able to assist in his own defense, and he was thus competent.  *Id.* at 11.  In support of this position, the State attaches various prison and medical records,

---

[12] While Collier has characterized sex offender treatment as a requirement, there was much discussion about this condition, vis a vis Collier's Fifth Amendment right to maintain his denial of the commission of the offense.  The court ultimately determined that it did not have the power to impose both phases of sex offender treatment as a condition of Collier's sentence prior to parole eligibility, given the constitutional concern at issue, and instead the court "strongly recommend[ed]" that Collier complete sex offender treatment prior to parole, but noted it was "not an outright requirement." See, (Doc. 11-17 at 191.)

which purportedly fail to show "any significant mental disability or deficiency during [Collier's] incarceration," but instead "show adequate, even if modest, intellectual functioning." *Id.*, referencing Exhibit 57. The State concludes that there is nothing contained in the state court record, or in this Court's record, to indicate Collier is so impaired that Sands should have requested a competency evaluation. *Id.* at 12.

Counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id*; see also, *Mickey v. Ayers*, 606 F.3d 1223, 1237 (9th Cir. 2010) (noting counsel cannot ignore "abundant signs" of mental illness or rest solely on a "preliminary examination").

The Supreme Court has recognized that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, *may be less culpable than defendants who have no such excuse.*" *Boyde v. California*, 494 U.S. 370, 382 (1990) (emphasis in original) (quoting *Penr v. Lynaugh* 492 U.S. 302, 319 (1989). Therefore, the Ninth Circuit has "long recognized an attorney's

duty to investigate and present mitigating evidence of mental impairment."
*Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005) (internal citations and
quotations omitted.)

Sands was aware that Collier had a mental impairment. Sands testified that
he was aware Collier had learning disabilities and appeared odd. (Doc. 66-3 at 10,
15.) While he did not know Collier's specific IQ, he acknowledged that Collier
appeared mentally slow to him. *Id.* at 9, 15 (Doc. 66-3 at 9). He also had concerns
about his decision-making ability, his ability to express himself, and how he would
appear to a jury. *Id.* at 36. Bohlman also testified the Collier's mental disability
was obvious and would have been readily apparent to an attorney representing him.
(Coc. 66-1 at 31, 41.)

Sands also demonstrated his awareness of Collier's diminished mental
capacity by at least mentioning the condition throughout the trial proceedings. At
the suppression hearing, for example, Sands elicited testimony from Collier that he
had difficulty understanding, and that he had been in special education classes due
to his learning disabilities. At the same hearing, Collier's mother testified that
Collier had been in special education classes, and that he was developmentally
disabled.

At the conclusion of the hearing, however, Sands was put on notice that the
district court was skeptical of Collier's self-report of his diminished mental

33

capacity, in part because Collier had competed high school and attended two years

of college studying computer science.  The Court also expressed its reservations

regarding the sincerity of Collier's professed lack of sophistication, and indicated

that it may have been contrived to serve his interests in the criminal case.

During trial, Sands also had Collier testify about his cognitive and learning

disabilities, and explain he had only studied computer science at the community

college for three days.  Sands also had Collier explain that he was on social

security disability for a back injury sustained in a car wreck and brain damage.[13]

Further, during Collier's sentencing hearing, Sands briefly attempted to

cross examine Sullivan regarding Collier's cognitive disabilities.  But no additional

information to support his mental impairment was presented to the court

Therefore, despite clearly recognizing his impairment, and touching on the

issue at various stages of the proceedings, Sands did nothing to investigate the

nature and extent of Collier's mental impairment.  Sands did not gather educational

records, medical records, or social security records.  (Doc. 66-3 at 15.)  Had he just

obtained his educational records from high school, Sands would have learned that

Collier was never mainstreamed in high school, and that testing demonstrated a

full-scale IQ of 58, falling in the mentally deficient range.  Sands also did not have

---

[13] It remains unclear if the brain damage Collier referenced was a result of the motor vehicle accident or potentially having his umbilical cord wrapped around his neck at birth.  See, (Doc. 66-2 at 4.)

Collier evaluated to determine the extent of his cognitive impairment.

This case is similar to *Ramirez* in this regard.  There, the petitioner had IQ scores of 70 and 77, and his counsel's interactions with him raised concerns about his intellectual function and ability to understand his circumstances.  *Ramirez*, 937 F.3d at 1244.  Despite being aware of these limitations, counsel failed to investigate or present a claim of mental impairment.  *Id.*  The Ninth Circuit noted "'[w]e have repeatedly held that counsel may render ineffective assistance if he is on notice that his client may be mentally impaired, yet fails to investigate his client's mental condition as a mitigating factor in a penalty phase.'"  *Id.* (quoting *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002)).

It is undisputed that Sands did not investigate Collier's mental status.  It is also apparent that Sands did not make a reasonable decision that made the investigation unnecessary.  In fact, it does not appear that the failure to investigate was the result of a considered, strategic decision.  It was just not done.

Sands believes none of Collier's educational records were obtained because he was never advised that Collier's mental impairment was a "predominant factor" in his ability to go to trial.  (Doc. 66-3 at 15-16.)  But regardless of what he discussed with Collier or his parents, Sands was clearly on notice that Collier had a mental impairment, and he conducted no investigation into the nature and extent of that impairment for sentencing purposes.

With respect to obtaining an evaluation, Sands does not recall whether he ever considered having Collier evaluated, but he pointed out that such an evaluation cannot be "done as a matter of ease and convenience." *Id.* at 26, 31. Sands explained that Collier or his parents would have had to pay for an evaluation, and they did not express an interest in doing so. *Id.* at 26. Nevertheless, it does not appear that the issue was investigated. Sands does not indicate that he discussed obtaining an evaluation with Collier. He just "assumes" it would have been "fairly expensive," but he acknowledges that he did not investigate whether state funding would have been available if Collier's family could not afford an evaluation. (Doc. 66-3 at 27.)

In short, Sands did not perform a meaningful investigation, including having Collier evaluated, in order to present mitigating evidence at sentencing. In light of the circumstances presented, Sands omissions fell "outside the wide range of professionally competent assistance" and constituted deficient performance. *Strickland*, 466 U.S. at 690.

## 2.  Prejudice

Given deficient performance, the Court next analyzes whether Collier has demonstrated prejudice as a result of trial counsel's deficient performance. With respect to *Strickland's* prejudice prong, the question is "whether there is a reasonable probability that, absent the errors, the sentencer…would have

concluded that the balance of aggravating and mitigating circumstances did not warrant" the sentence imposed. *Strickland*, 466 U.S. at 695. The Court must assess prejudice based upon the totality of the available mitigating information. See, *Porter v. McCollum*, 558 U.S. 30, 41 (2009). To establish prejudice, the additional mitigation evidence must do more than "barely alter" the sentencing profile already presented to the sentencing judge. *Strickland*, 466 U.S. at 699-700.

Here, evidence of Collier's mental impairment would have done more than barely alter his sentencing profile. Without the evidence, the district court was left with the belief that Collier was an individual capable of graduating from high school and successfully completing two years of college. The court was also left with the impression that Collier's simple, unsophisticated presentation may have been contrived to benefit him in his criminal case; or worse, to facilitate the exploitation of others. The court's observations and impressions were left unchallenged. These beliefs and concerns would have been dispelled by evidence of Collier's low mental functioning. Collier's readily available education records would have revealed a full-scale IQ of 58, and would have shed light on the true level of his academic accomplishments. More recent intelligence testing demonstrated a full-scale IQ of 69. Both IQ scores would place Collier in the range of intellectual disability, or what was formerly characterized as mild mental retardation.

This evidence is significant on its own.  As discussed above, the Supreme Court has recognized our societal belief that individuals who commit criminal acts that are attributable to emotional or mental problems may be considered less culpable than others.  *Boyde*, 494 U.S. at 382.  Accordingly, Montana law in place at the time of Collier's sentencing required sentencing courts to "consider a defendant's mental condition, in part, to better determine the appropriate commitment regime and to avoid cruel and unusual punishment."  *State v. Rathbun*, 75 P.3d 334, 336 (Mont 2003) (citing *State v. Korell* 690 P.2d 992 (Mont. 1984).  Therefore, Collier's mental deficiency would have been an important factor in determining an appropriate sentence.

The evidence was also important for other considerations.  Montana statues required a court to consider claims of mental disease or defect in sentencing:

> Whenever a defendant is convicted on a verdict of guilty or a plea of guilty or nolo contendere and claims that at the time of the commission of the offense of which convicted the defendant was suffering from a mental disease or defect that rendered the defendant unable to appreciate the criminality of the defendant's behavior or to conform the defendant's behavior to the requirements of law, the sentencing court shall consider any relevant evidence presented at trial and shall require additional evidence as it considers necessary for the determination of the issue, including examination of the defendant and a report of the examination as provided in 46-14-202 and 46-14-206.

MCA § 46-14-311 (2001).  Additionally, state law provided:

> (2) If the court finds that the defendant at the time of the commission of the offense suffered from a mental disease or defect as described in 46-14-311, any mandatory minimum sentence prescribed by law for

Case 1:15-cv-00079-SPW   Document 68   Filed 03/02/20   Page 39 of 42

the offense need not apply and the court shall sentence the defendant
to be committed to the custody of the director of the department of
public health and human services to be placed, after consideration of
the recommendations of the professionals providing treatment to the
defendant, in an appropriate correctional or mental health facility for
custody, care, and treatment for a definite period of time not to exceed
the maximum term of imprisonment that could be imposed....

MCA § 46-14-312(2) (2001).

The court considered many factors in imposing sentencing, but it did not

consider Collier's mental condition. The obvious reason for this omission was no

evidence was presented to the court regarding Collier's mental impairment. Thus,

the court had no basis to consider Collier's mental condition at the time of the

offense, nor could it determine whether Collier was able to appreciate the

criminality of his behavior or to conform his behavior to the requirements of law.

And while the court considered alternative placements to the Montana State Prison,

including a community corrections or prerelease facility, it does not appear the

court considered a potential placement with the Department of Health and Human

Services. See, (Doc. 11-19 at 3-4.) The district court also did not have the

opportunity to consider whether Collier had the ability to complete the sex

offender treatment program in prison.

There is also every indication that, had the court been presented with

evidence of Collier's mental disability, the court would have carefully weighed

that consideration. The test for prejudice is an objective standard and does not

39

depend on the characteristics of the particular decisionmaker, "such as unusual propensities toward harshness or leniency." *Strickland*, 466 U.S. at 695. "The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id.* Nevertheless, it is apparent that the district court carefully considered other issues at sentencing. For example, the court carefully considered Collier's Fifth Amendment right against self-incrimination as it pertained to imposition of the sex offender treatment component of the sentence. (Doc. 11-17 at 122-123, 174-180); see also, fn. 12, supra. In addition, the district court expressed its concern of the issue of Collier's mental capacity at the outset of postconviction proceedings, noting "the trial process did not address mental capacity," and recognizing that Collier's "assertion that he is unable to fully appreciate all of the circumstances [was] serious." (Doc. 11-30 at 1-2.)

Thus, there is certainly reason to believe the district court would have given the same careful consideration to Collier's claim of diminished mental capacity, had it been provided the opportunity to do so. But the sentencing the court was not provided any mitigation evidence regarding Collier's mental capacity. It was, therefore, not presented the opportunity evaluate Collier's mental impairment to determine an appropriate sentence and commitment regime. The court was not given evidence to determine whether the state statutes regarding mental

disease/defect were applicable, and whether a commitment to the Department of Public Health and Human Services would have been appropriate.

Additional evidence should have been offered at sentencing. It would have significantly altered Collier's basic sentencing profile presented to the sentencing judge. *Strickland*, 466 U.S. at 699-700. Failure to present the evidence is certainly sufficient to undermine confidence in the outcome of the sentencing phase of Collier's case. Collier has thus established prejudice.

## III.   CONCLUSION

Collier has established cause and prejudice to excuse his procedural default under *Martinez*. He has also demonstrated under the *Strickland* standard that his trial counsel's performance in connection with his sentencing was deficient, and that he was prejudiced as a result.

Therefore, it is **RECOMMENDED** as follows:

1. The State of Montana's Motion to Dismiss Petitioner John W. Collier's Amended Petition for Writ of Habeas Corpus (Doc. 62) should be **DENIED**.

2. In relation to Collier's remaining ineffective assistance of trial counsel claim, the Amended Habeas Petition should be **CONDITIONALLY GRANTED**.

3. Within 60 days, the matter should be remanded to Montana's Fourteenth Judicial District Court, Musselshell County, for a new sentencing hearing. If the state does not meet the deadline for remand and resentencing, Collier should be

released from custody.

DATED this 2nd day of March, 2020.

/s/ Timothy J. Cavan
Timothy J. Cavan
United States Magistrate Judge